UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br>    v.<br><br>GENNARO ANGIULO,<br><br>    Defendant | No. 1:20-cr-10218-DPW |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully submits this memorandum in support of its sentencing recommendation for the Defendant Gennaro Angiulo ("Defendant" or "Angiulo") of incarceration for twenty-seven months, supervised release for two years, a special assessment of $200, forfeiture in the amount of $430,000 and restitution to the Internal Revenue Service ("IRS") in the amount of $1,769,486.  This sentence is warranted based upon the Defendant's conduct over many years in evading payment of taxes by having checks cashed so that he could pay his employees in part in cash every Friday.  This below-guideline sentence is also warranted based upon the defendant's history and characteristics – including his failure to pay payroll taxes resulting in multiple prior federal tax liens for tax years 2002 through 2006.  A multi-year term of incarceration is also necessary to provide appropriate deterrence and to avoid sentencing disparities between this defendant and similarly situated tax violators as well as between such a white-collar defendant and others in the criminal justice system.

I.      STATEMENT OF OFFENSE

On November 2, 2020, pursuant to a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), Angiulo pleaded guilty to an Information alleging one count of Failure to Collect or Pay Over Tax in violation of 26 U.S.C. § 7202 and one count of Evading Cash Transaction Reporting Requirements in violation of 31 U.S.C. § § 5324(a)(1) and (d)(2).

Angiulo owns and operates GJ Towing, Inc. ("GJ Towing"), a vehicle towing and recovery business in Revere, Massachusetts. From at least 2008 through early 2018, Angiulo caused GJ Towing to pay a large portion of its employees' wages "under the table." He did this by regularly cashing or having his employees cash checks received by the business or written to cash or to himself at various check cashing businesses. He grouped checks in amounts of $10,000 or less to avoid cash transaction reporting (CTR) reporting requirements.

This was not an occasional thing – throughout this nearly ten-year period, Angiulo and/or his employees cashed checks multiple times a week. Each Friday, Angiulo or another employee met with his employees in the GJ Towing Dispatch room and handed out their cash wages to avoid paying federal employment taxes.

Thus, to carry out these crimes, Angiulo involved many of his employees, including loyal employees of many years who served as bookkeepers and accountants. He regularly sent his employees to two separate check cashers on the same day to cash checks. Between 2014 and early January 2018, he cashed GJ Towing customer checks in groups totaling between $9,000 and $9,999 hundreds of times. The government estimates that Angiulo structured transactions by cashing checks in amounts of $10,000 or under totaling approximately $3,394,968.

Angiulo caused GJ Towing to file IRS Forms 941 that he knew were false in that they underreported the wages received by GJ Towing's employees and the payroll taxes due. In so doing, Angiulo caused GJ Towing and its employees to underpay federal payroll taxes, including Medicare and Social Security, by at least $1,769,486. In addition, for at least the tax periods from January 2014 through June 2017, Angiulo caused GJ Towing to fail to pay payroll taxes on the portion of the payroll that the company did report, causing an additional tax loss of at least $1,610,447.

THE PARTIES' POSITION ON GUIDELINES

Pursuant to the plea agreement, the parties agree that the Defendant's total offense level under the Guidelines are calculated as follows:

1. **Failure to Account for and Pay Over Tax in Violation of 26 U.S.C. § 7202**

    a) Defendant's base offense level is 22, because the tax loss caused by his offense, including all relevant conduct, is more than $1,500,000 but not more than $3,500,000 (USSG § 2T4.1(I);

2. **Evading Cash Transaction Reporting, 31 U.S.C. § 5324(a)(1)**

    a) Defendant's base offense level is 22 (6 +16), because the amount of funds structured including all relevant conduct is more than $1.5 million and less than $3.5 million (USSG § S1.3(2) & 2B1.1(b)(I);

    b) Defendant's offense level is increased by 2 because the Defendant committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period. (USSG § 2S1.3(b)(2);

3. **Grouping and Acceptance of Responsibility**

    a) Defendant's total offense level is 24 because the tax and evading cash transaction reporting charges are closely related counts that group together. (USSG § 3D1.2(d);

    b) Defendant's offense level is decreased by three, because Defendant has accepted responsibility for Defendant's crimes (USSG § 3E1.1).

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the U.S. Attorney and Defendant have agreed that the following is a reasonable and appropriate disposition of this case:

    a) a sentence within the following range: home confinement for a period of 18 months and incarceration for a period of 27 months;

    b) 24 months of supervised release;

    c) a mandatory special assessment of $200, which Defendant must pay to the Clerk of the Court by the date of sentencing;

      d) forfeiture in the amount of $430,000; and

      e) restitution in the amount of $1,769,486 to the Internal Revenue Service.

II.    APPLICATION OF GUIDELINES AND SECTION 3553(a) FACTORS

The Guidelines "serve as the starting point for the district court's decision and anchor the court's discretion in selecting an appropriate sentence." *United States v. Molina-Martinez*, 136 S. Ct. 1338, 1349 (2016). Once the sentencing court has established the Guidelines Sentencing Range (including a consideration of any applicable departures), it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a). *United States v. Dixon*, 449 F.3d 194, 204 (1st Cir. 2006). The goal is to fashion "a sentence sufficient, but not greater than necessary," for the achievement of the legitimate objectives of sentencing. 18 U.S.C. § 3553(a); *Dixon*, 449 F.3d at 204.

In this case, the 3553(a) factors also support the sentence recommended by the Government here. The Government's agreement to a Fed. R. Crim. P. 11(a)(1)(C) plea with a range is not an indication that it deems a sentence of home detention appropriate here. To the contrary, the government submits that a sentence of more than two years of incarceration is the appropriate sentence here based upon all the 3553(a) factors as set forth below.

    A.  <u>Nature, Circumstances, and Seriousness of the Offenses</u>

Defendant's crimes are serious and extensive. The defendant was a successful business owner with significant wealth. His towing company makes its wealth in part by towing cars of people who have violated parking regulations. He receives contracts from the state for towing work. In these, and many other ways, he and his businesses benefit from government services. But rather than pay his fair share of those services, the defendant went to great efforts year after year for nearly ten years to evade tax obligations by cashing checks, structuring the funds to

avoid detection and using the cash to pay employees under the table.

Moreover, by failing to report and pay employment taxes on much of the payroll for his employees, defendant did not merely evade taxes. He also involved his many employees in tax crimes and reduced his employees' long-term benefits. Later in life, when these employees claim Social Security benefits, they will not get credit for the cash wages they received because they and their employer did not report the wages or pay over Social Security or Medicare taxes on a significant portion of their earnings for many years.

B.  History and Characteristics of the Defendant

This is not the first time Angiulo has had tax issues. Federal tax liens totaling $1,332.076 were filed against GJ Towing for unpaid quarterly taxes between about 2002 and 2006. In about 2011, Angiulo agreed to a monthly payment plan with the IRS to pay off this debt in regular installments until about 2011. In about late 2012, however, Angiulo stopped making any payroll tax payments to the IRS, even on the portion of employees' income he was reporting. Also, it appears that Angiulo did not report a salary or receive a W-2 himself from GJ Towing for tax years 2009-2012 and 2014 to 2017.

Thus, this ten-year history of cashing checks, paying cash under the table and underreporting is not an aberration for the defendant or an isolated incident. Having gotten caught not paying his employment taxes for years in the past, and had multiple federal tax liens against his business, the defendant concealed his failure to pay his employees payroll taxes – by paying them in cash and cashing checks and keeping the funds out of the corporate accounts. This is the defendant's way of doing business. He involved his many employees and his trusted staff in the crimes, week after week, year after year. This is part of who the defendant is - a

person who is so determined not to pay his fair share of taxes that even after getting federal tax liens, he continued to pay his employees in cash to try to hide payroll from the IRS.

If Angiulo wanted to provide better compensation for his employees, he certainly could have done so – by paying them more. He is a man of considerable wealth with three apparently quite profitable businesses in addition to his real estate holdings. In October 2016, Angiulo applied for a mortgage and the loan application stated that Anguilo's net worth was over $15 million and that the co-applicant, his mother Barbara Lombard's net worth was also over $15 million. He had no financial need to underreport his taxes all these years. He was just determined to cheat the IRS and his fellow citizens year after year.[1] When a person of such wealth, opportunity and influence over others takes advantage of their position for no reason other than to have more money, a serious sentence of incarceration is merited.

### C. Need to Promote Respect for the Law and Just Punishment

Nor is such a tax crime one that does not merit jail time. To the contrary, jail time is particularly important in tax crimes where there is such a financial incentive to commit the crime. The criminal tax laws are designed to protect the integrity of the nation's tax system, which is dependent upon a system of voluntary compliance. The tax laws of our country, in effect, reflect an honor system under which citizens are required to cooperate with the government. It is vital that when a citizen is non-compliant, that citizen is appropriately punished. *See United States v. Zukerman,* 897 F.3d 423, 427 (2d Cir. 2018) (explaining that "'tax crimes represent an especially damaging category of criminal offenses,' which 'strike at the foundation of functioning government'") (citations omitted).

---

[1] The defendant also may raise certain health issues and the existence of the current pandemic. These issues, however, can be addressed, if necessary, by a deferral of the defendant's report date and should not affect the length of his incarceration.

Here, Angiulo has already failed to pay payroll taxes in the past and was given many years to repay those obligations, pay his back taxes and comply with the tax laws. Instead, he embarked on a course of further concealing his conduct to evade his tax obligations and those of his employees. Week after week, year after year, he cashed checks under the CTR reporting threshold and paid the employees on Fridays in whole or part in cash. This long-term pattern of behavior demonstrates a very deliberate effort to violate the law.

D. <u>Need to Afford Adequate Deterrence</u>

The Sentencing Guidelines provide that deterrence should be the primary consideration when sentencing defendants for tax crimes. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is of the utmost importance when punishing criminal tax violations. USSG § 2T1, introductory cmt. (2016). Here, the Defendant's willful refusal to pay his fair share, along with his continued conduct after failure to pay and tax lien, demonstrate that both specific and general deterrence are necessary.

As to specific deterrence, this defendant's history of having already gotten away with not paying taxes and removing a federal tax lien before, make clear that he himself needs a serious sentence to deter him from his continued efforts to avoid paying taxes.

Such a sentence is also necessary to serve the purposes of general deterrence. Failure to sentence Angiulo, a wealthy and successful businessman who committed tax crimes for years, having already been caught not paying the taxes due, to a significant term of incarceration would send the wrong message – the message "that would-be white-collar criminals stand to lose little more than a portion of their ill- gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). It is important both to "the deterrence of white-

collar crime (of central concern to Congress)", and "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (cited and quoted with approval in *United States v. Levinson*, 543 F.3d 190, 197 (3d Cir. 2008) (noting that "probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class."). *See also United States v. Sample*, 901 F.3d 1196, 1198-1201 (10th Cir. 2018) (vacating sentence for white-collar defendant sentenced to probation to allow him to work and repay victims as impermissibly sentencing based on the defendant's income); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose."); *United States v. Ture*, 450 F.3d 352, 359 (8th Cir. 2006) (explaining that deciding against imprisonment because a defendant "owes a substantial amount of back taxes, interest, and penalties . . . is entirely improper and . . . results in bad public policy"); *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity."). *Cf.* 28 U.S.C. § 994(d)(11) (requiring that the Commission "shall assure that the guidelines and policy statements are

8

entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders").

Thus, the fact that the defendant is a business owner and committed a non-violent crime should not result in his not serving jail time for his extensive criminal conduct. It is not a fair system of justice if those with means and who own businesses can avoid jail time by virtue of arguing that incarceration will disrupt the running of their business or the employment of others. Moreover, the defendant has had ample time while this plea was being negotiated and before sentencing to arrange for his business to be managed by others in his absence, as he has apparently begun to do by transferring certain control to his sister.

General deterrence through serious sentences for criminal tax fraud is an essential means of minimizing the ever-increasing amount of money estimated to be lost each year through tax fraud. The IRS's study of tax compliance estimates that only 83.1% of individuals are compliant, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes. *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016 (Att. O). Hundreds of billions of dollars are lost annually because people like Angiulo – who otherwise take full advantage of what this country offers – shirk their responsibilities as American taxpayers.

Widespread noncompliance with the tax laws is thus an important consideration when sentencing for tax offenses. Meaningful sentences that through their terms speak loudly are necessary to deter such conduct. Absent such deterrence, others with the means and opportunity to enrich themselves at the cost of other taxpayers will cynically conclude that the potential rewards of such criminal activity outweigh the risks of being caught and punished. The sentence in this case should send a strong message to would-be tax cheats that a significant term of imprisonment is a reality for willful tax fraud. The sentence should also assure law-abiding

taxpayers that they are not foolish for paying their fair share of taxes.

Our tax system depends on the voluntary compliance of honest taxpayers. A serious sentence of imprisonment promotes voluntary compliance by making clear that there are consequences for hiding income from the government. Sentencing Angiulo to a significant multi-year term of incarceration will convey the message to others that systematic and repeated efforts to cheat on one's taxes will be met with strong punishment.

E. The Need to Avoid Unwarranted Sentence Disparities Among Defendants Guilty of Similar Conduct

The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished. *See* S. Rep. No. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."). Then-Judge Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988).

In considering the issue of unwarranted disparities in sentences, the Court should consider the need to avoid sentencing disparities between this crime and other crimes motivated by the desire to obtain money. The need to avoid disparities between such crimes and the gulf

10

between white collar sentences and non-white collar sentences calls strongly for a serious sentence here where a prominent businessman chose for many years to deliberately flout the law and cheat his fellow-taxpayers.

To put the defendant's crimes in context, according to the IRS Tax Statistics, the average sentence for a tax case in 2020 was 44 months.  https://www.irs.gov/pub/irs-pdf/p3583.pdf, (Appendix at p. 67).  According to Sentencing Commission Statistics for 2019, the median loss in tax cases was $296,429 and the average sentence was 16 months imprisonment for tax cases and 68 months for money laundering cases. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table15.pdf.  Angiulo's tax loss, even before the enhancement for structuring, is thus almost exactly the average for 2019 and his recommended sentence of 27 months is also consistent with the range of sentences nationally for such offense.   Here, the tax loss of more than $3 million is almost ten times the average loss.  Moreover, 86.6% of the cases involved loss amounts of $1.5 million or less.  Thus, Angiulo's tax loss alone puts him not at the average of sentence, but in the top 15%.  The requested sentence is thus appropriate in comparison to sentences received by other tax offenders and an appropriate, reasonable and not more than necessary sentence for a serious multi-year tax crime by the business owner.

## CONCLUSION

Defendant made a deliberate choice to take advantage of the federal tax system for personal profit at the expense of the United States and other honest taxpayers.  The Government respectfully submits that the below-guideline sentence of twenty-seven months is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By:   /s/ *Sara Miron Bloom*
       SARA MIRON BLOOM
       Assistant United States Attorney
       John Joseph Moakley United States Courthouse
       1 Courthouse Way, Suite 9200
       Boston, MA 02210
       (617) 748-3265

Dated: February 23, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

        /s/ *Sara Miron Bloom*
        Sara Miron Bloom
        Assistant United States Attorney

Date: February 23, 2021